# In the United States Court of Federal Claims

### Nos. 14-6L, 14-38L
### Filed: February 28, 2017

```
* * * * * * * * * * * * *    *
TIMOTHY A. JAMES, et al.,     *
WILHELMEAN BROWN, et al.,[1]  *
                             *
                             *
              Plaintiffs,     *
                             *
v.                           *
                             *
UNITED STATES,               *
                             *
              Defendant.      *
                             *
* * * * * * * * * * * * *    *
```

**Cross-Motions for Partial Summary Judgment; Takings Claim; Trails Act, 16 U.S.C. § 1241 et seq. (2012); S.C. Code § 57-3-220(A).**

    **Mark F. Hearne, II**, Arent Fox, LLP, Clayton, MO, for the <u>James</u> plaintiffs. With him are **Lindsay S.C. Brinton** and **Meghan S. Largent**, Arent Fox, LLP, Clayton, MO.

    **Elizabeth G. McCulley**, Stewart, Wald & McCulley LLC, Kansas City, MO, for the <u>Brown</u> plaintiffs. With her is **Thomas S. Stewart**, Stewart, Wald & McCulley LLC, Kansas City, MO.

    **Jacqueline C. Brown**, Trial Attorney, Environment & Natural Resources Section, Department of Justice, Washington, D.C., for defendant. With her was **Jeffrey H. Wood**, Acting Assistant Attorney General, Environment & Natural Resources Division, Department of Justice, Washington, D.C.

## O P I N I O N

<u>**HORN, J.**</u>

### FINDINGS OF FACT

    In these consolidated rails-to-trails cases, plaintiffs are landowners in South Carolina who allege that they are entitled to receive just compensation under the Fifth Amendment to the United States Constitution because the United States government

---

[1] These cases were originally captioned <u>Rosalyn G. Burns, et al. v. United States</u>, No. 14-38L, and <u>Timothy A. James, et al. v. United States</u>, No. 14-6L. After Ms. Burns changed representation to become a plaintiff in <u>Timothy A. James, et al. v. United States</u>, No. 14-6L, the court issued an Order changing the case caption of the <u>Burns</u> case to <u>Wilhelmean Brown, et al. v. United States</u>, retaining the case number 14-38L.

effected takings of their reversionary property interests by operation of the National Trails System Act, 16 U.S.C. § 1241, et seq. (2012) (the Trails Act). Plaintiffs own property adjacent to the railroad line at issue in the above-captioned cases, which is operated by the South Carolina Central Railroad Company, LLC (SC Central) and extends from milepost 319.89 near Society Hill, South Carolina to milepost 332.68 near Cheraw, South Carolina. Plaintiffs allege that the United States destroyed plaintiffs' reversionary rights to exclusive use and possession of their land when the United States Surface Transportation Board (STB) issued a Notice of Interim Trail Use (NITU) related to the railroad line adjacent to their property.

Although plaintiffs' claims relate to the same 12.8 mile railroad line in Chesterfield and Darlington counties, South Carolina, plaintiffs initially filed their takings claims as two separate cases in the United States Court of Federal Claims, which were identified as Timothy A. James, et al. v. United States, No. 14-6L (Fed. Cl. Jan. 2, 2014), and Rosalyn G. Burns, et al. v. United States, No. 14-38L (Fed. Cl. Jan. 16, 2014) (now captioned Wilhelmean Brown, et al. v. United States), filed on January 2, 2014 and January 16, 2014, respectively. At the time the complaints were filed, plaintiffs in James were represented by Mark F. Hearne II of Arent Fox, LLP, and plaintiffs in the then-captioned Burns case were represented by Elizabeth A. McCulley of Baker Sterchi Cowden & Rice.[2] As a result of both counsel's solicitation activities at or around the time when both cases were initiated, the separate complaints filed in Brown and James listed three of the same plaintiffs: Rosalyn Gail Burns, Ruby Mae Jefferson, and Sarah Moody. On February 12, 2014, counsel for plaintiffs in Timothy A. James, et al. v. United States moved to intervene in the matter of Rosalyn G. Burns, et al. v. United States. On February 27, 2014, the court held a hearing with defendant and plaintiffs' counsel in both cases to discuss the motion to intervene and how the two cases would proceed moving forward. At the hearing, counsel for plaintiffs in James and Burns, now Brown, agreed to consolidate the two separate actions. On March 7, 2014, the court issued an Order consolidating Rosalyn G. Burns, et al. v. United States, No. 14-38L (now captioned Wilhelmean Brown, et al. v. United States), and Timothy A. James, et al. v. United States, No. 14-6L, for case management purposes. Given some of the prior activity to engage clients, the court ordered counsel for plaintiffs in both cases to submit to the court an updated chart identifying the correct case and counsel for each of the named plaintiffs and the date of client engagement.

On May 29, 2014, counsel in James and Brown filed separate, amended complaints clarifying the individual plaintiffs named in each of the two cases. In the Brown case plaintiffs filed a complaint, a first amended complaint, and a second amended complaint. The James plaintiffs filed a complaint and five amended complaints, with the last of the five filed on April 8, 2015. These amended complaints identify each plaintiff

---

[2] On April 16, 2015, Ms. McCulley filed a notice of change of law firm and address indicating that she had changed to a new law firm, Stewart, Wald & McCulley LLC, and was no longer associated with Baker Sterchi Cowden & Rice, LLC.

and clarify that Rosalyn Gail Burns and Ruby Mae Jefferson, who were initially named as plaintiffs in both <u>James</u> and <u>Brown</u>, are now plaintiffs in <u>James</u>, and Sarah Moody, who also initially was named as a plaintiff in both <u>James</u> and <u>Brown</u>, is a plaintiff in <u>Brown</u>. Therefore, after all of the amended complaints, the plaintiffs in <u>James</u> are as follows: Timothy A. James and Lorraine G. James, Joseph Bell-Bay, J. Scott Bennett, Beatrice K. Bradshaw, Keith Thomas Bradshaw, Mamie Broady, Miriam M. Burn, Rosalyn Gail Burns, Howard Clifton Chapman, Carolyn C. Cole, Julia W. Covington, Cribb Family Limited Partnership, Davis & Co., Inc., Margaret D. Davis, heirs of Mastin Fuller, James Flowers, Jr., Debra Piner on behalf of the Walter F. Godfrey estate, Tomuel Goggins, Belton Grooms, Robin Hepburn, James E. Hill, Daisy L. Hooks, Darren Hooks, Ruby Mae Jefferson, J.L. Anderson Company, Frank M. Kelly, Amanda Knowlin, Amanda Walker on behalf of Thurman D. Lewis and Geraldine Lewis, Eric Dewayne Loflin, Mary Floyd McCormick, Jimmy Samuel McMillon and Glenda Hubbard McMillon, Mutli-Systems Electrical Constructors, Inc., Julian Nolan, Robert P. Nolan, Pentecostal Assembly Holiness Church, Flora Hooks Peyton, John Lewis Rivers III, Sarah Sellers, Robin Hepburn on behalf of Victoria C. Smith, Sonoco Products Company, William A. Sylvia, Town of Cheraw, Joann K. Warr, and Wing Fowler Properties, and counsel of record is Mark F. Hearne, II, of Arent Fox LLP. The plaintiffs in <u>Brown</u> are as follows: Wilhelmean Brown, Thomas Gary, Jr., Jesse W. James and Carlean Strong James, Sarah Moody, Daisy M. Gainey, Polly C. Moore, Gaston Harris and Mary Harris, William S. Johnson, Sr. and Mamie J. Johnson, Marian Jean Johnson, James P. McQueen and Annie B. McQueen, Benny Hart Moore, Alexander Sturdivant and Daisy Sturdivant, Ransom Wilson, Theodore A. Kirby, Dr. N.H. Beaver, L.E. Covington, Jr., C. Rodney Michael and Tonya H. Michael, and James Douglas and Joy C. Myers, and counsel of record is Elizabeth McCulley of Stewart, Wald & McCulley LLC.

The 12.8 mile railroad line at issue in the above-captioned cases was initially constructed by the Cheraw and Darlington Railroad Company pursuant to an Act of the South Carolina legislature in 1849. <u>See</u> 1849 S.C. Acts 583. The Act provided, in pertinent part:

> *Be it enacted*, by the Senate and House of Representatives now met and sitting in General Assembly and by the authority of the same, That for the purpose of establishing a communication by Rail Road from Cheraw to some point on the Wilmington and Manchester Rail Road in the District of Darlington, the formation of a corporate Company, is hereby authorized to be called the Cheraw and Darlington Rail Road Company, which . . . is hereby authorized to construct a Rail Road from the Town of Cheraw to some point on the Wilmington and Manchester Rail Road, in the District of Darlington, by a route to be determined by said Company after the same shall have been formed.

1849 S.C. Acts 583 (emphasis in original). The Act provided further that "the powers, rights and privileges, granted by the Charter of the Wilmington and Manchester Rail Road Company to that Company, shall be and are hereby granted to the Cheraw and Darlington Rail Road Company." 1849 S.C. Acts 584. The Charter to create the Wilmington and Manchester Railroad Company was enacted by the state of South Carolina in 1846. <u>See</u>

1846 S.C. Acts 381. The 1846 Act authorized the railroad company to acquire the property on which to construct the railroad through eminent domain, contract, and the presumption of grants of land. See 1846 S.C. Acts 386-89. The 1846 Act stated:

> That the said President and Directors, their officers, agents and servants, shall have full power and authority to enter upon all lands and tenements, through which they may desire to conduct their Rail Road, and to lay out the same according to their pleasure, so that the dwelling house, yard, garden or graveyard of no person be invaded, without his consent, and that they shall have power to enter in and lay out such contiguous lands as they may desire to occupy, as sites for deposites, toll houses, warehouses, engine sheds, workshops, water stations, and other buildings, for the necessary accommodation of their officers, agents and servants, their horses, mules, and other cattle, and for the protection of the property entrusted to their care.

1846 S.C. Acts 388. Defendant submits that the Cheraw and Darlington Railroad Company acquired the property to construct the railroad by deed and by condemnation. Plaintiffs contend that the railroad only acquired prescriptive easements for railroad purposes because the railroad was constructed through the exercise of eminent domain and without the underlying landowners' permission or consent.

On December 19, 2011, SC Central filed a Notice of Exemption with the STB seeking authorization "to abandon approximately 12.8 miles of line in Chesterfield and Darlington Counties, SC, between milepost 319.89 +/-, near Society Hill, SC, and milepost 332.48, in Cheraw, SC" pursuant to "the class exemption at 49 C.F.R. § 1152.50." In the Notice of Exemption, SC Central stated that "[t]here are no local shippers on the Line" and that "[n]o local rail traffic" had moved over the line for the previous two years. According to the Notice of Exemption, the "last traffic to move over the Line was in July 2009." The Notice of Exemption also proposed February 8, 2012 as the abandonment date. SC Central stated in the Notice of Exemption that it "believes that the property proposed for abandonment is suitable for other public purposes." The Notice of Exemption was filed in the Federal Register on January 6, 2012, and stated that, in the event SC Central did not file a notice of consummation of the abandonment by January 6, 2013, "the authority to abandon would automatically expire."

Thereafter, on January 12, 2012, the Town of Cheraw filed a request with the STB for the "issuance of a Public Use Condition as well as an Interim Trail Use Condition rather than an outright abandonment authorization for approximately 12.8 miles of line in Chesterfield and Darlington Counties, South Carolina." (emphasis removed). The Town of Cheraw requested that the STB issue a NITU so that the Town of Cheraw could negotiate with SC Central for acquisition of the line for use as a trail under the Trails Act. SC Central agreed to negotiate interim trail use/rail banking with the Town of Cheraw for the 12.8 mile railroad line between the Town of Cheraw and Society Hill. As a result of the agreement between SC Central and the Town of Cheraw to negotiate the interim use of the railroad corridor as a recreational trail and preservation for railbanking purposes, the STB issued a NITU on February 3, 2012. The NITU permitted the Town of Cheraw

"to negotiate with SCRF [SC Central] for interim trail use/rail banking of the ROW [right-of-way]." The NITU directed that "[t]he parties may negotiate an agreement during the 180-day period," and stated that "[i]f no agreement is reached within 180 days, SCRF may fully abandon the line." The NITU further states that "[u]se of the ROW for trail purposes is subject to any future use of the property for restoration of railroad operations."

After several months, the negotiations between SC Central and the Town of Cheraw ended without reaching an interim trail use agreement. As a result, the STB issued an order vacating the February 3, 2012 NITU on June 20, 2012 because "the Town no longer consents to continued negotiations and has indicated that it no longer is willing to assume the responsibilities required of a trail sponsor under the Board's interim trail use regulations." The STB's June 20, 2012 decision explained that the Town of Cheraw filed a document titled "Notice of Termination of Negotiations between the Town and SCRF to acquire the ROW, and Notice of the Withdrawal of all Purchase Offers by Town to SCRF, and . . . Town's Request That STB Amend Its Prior Decision." According to the STB, after the February 3, 2012 NITU was vacated, as of August 2012, there were "no legal or regulatory barriers" preventing SC Central from consummating the abandonment of the railroad line, however, SC Central had to file a notice of consummation of the abandonment by January 6, 2013 or the authority to abandon would automatically expire. Instead of filing a notice of consummation of abandonment by January 6, 2013, however, SC Central entered into negotiations with another entity, and the January 6, 2013 deadline lapsed.

After the negotiations between SC Central and the Town of Cheraw ceased, SC Central entered into trail use negotiations with the Friends of Cheraw to Society Hill Railtrail (Friends of Cheraw). The Friends of Cheraw had not requested a NITU before entering into negotiations with SC Central. In a February 14, 2013 letter to the STB, approximately eight months after the February 3, 2012 NITU was vacated on June 20, 2012, SC Central requested that the STB extend the filing deadline for SC Central's notice of consummation of the railroad abandonment because "after interim trail use negotiations between SCRF and the Town ended, SCRF began interim trail use/rail banking discussions with the Friends of the Cheraw Trail" and an extension of the consummation deadline was necessary for those negotiations to continue. In an April 2, 2013 decision, the STB granted, in part, SC Central's request for an extension of time to consummate the abandonment of the railroad line until June 2, 2013. On May 24, 2013, the Friends of Cheraw requested that the STB issue a NITU for the 12.8 railroad line so that the Friends of Cheraw and SC Central could continue the negotiations "to establish interim trail use and rail banking under section 8(d) of the National Trails System Act, 16 U.S.C. 1247(d)." On May 28, 2013, SC Central submitted a letter to the STB supporting the Friends of Cheraw's request for the issuance of a NITU. On May 31, 2013, the STB issued a second NITU permitting SC Central and the Friends of Cheraw to negotiate an agreement regarding the 12.8 mile railroad line. The May 31, 2013 NITU stated that "[u]se of the right-of-way for trail purposes is subject to possible future reconstruction and reactivation of the right-of-way for rail service," and that "[i]f no agreement is reached within 180 days, SCRF may fully abandon the Line." The May 31, 2013 NITU also modified the notice of exemption previously published in the Federal Register on January 6, 2012 "to the extent necessary to implement interim trail use/rail banking . . . to permit

the Cheraw Friends to negotiate with SCRF for trail use for the rail line . . .". Based on submissions from the parties, it appears that the STB extended the consummation of abandonment deadline from November 27, 2013 to January 16, 2015, and the authority to abandon the railroad expired on January 16, 2015, pursuant to the STB's order, several months before SC Central submitted its notice to discontinue service.

SC Central and Friends of Cheraw engaged in negotiations for a trail use agreement for more than two years before October 5, 2015, when the Friends of Cheraw notified the STB that the organization withdrew from negotiations with SC Central.  In its letter to the STB, Friends of Cheraw stated: "Please be advised that Friends of Cheraw to Society Hill Rail Trail has withdrawn from all negotiations with SCRF and therefore terminates its interest in the pending NITU. The parties have mutually agreed that there is no basis for reaching a definitive agreement."

After negotiations between SC Central and Friends of Cheraw ceased, and the above-captioned cases had been initiated in this court, on November 19, 2015, SC Central sent a letter to the STB stating that "in lieu of a full abandonment of the Line," SC Central decided "to consummate the discontinuance of service over the Line as of November 19, 2015." In the letter, SC Central stated that it would "be unable to enter an agreement for interim trail use/rail banking."

Although the James and Brown plaintiffs filed separate complaints, the allegations in both complaints arise from and revolve around the same facts. In both the James and Brown complaints, plaintiffs allege that they are residents and landowners in Chesterfield and Darlington counties in South Carolina who owned land adjacent to, and underlying, the railroad line owned and operated by SC Central at all times pertinent to their takings claims. The parties in both cases have stipulated that all plaintiffs owned fee title to property adjacent to, and underlying, the railroad corridor on which the railroad operated at the time of the alleged taking on February 3, 2012. The parties in both cases also have stipulated that, for purposes of partial summary judgment, the railroad held an easement for railroad purposes that laid across plaintiffs' property.

In their final amended complaints, James, filed on April 8, 2015, and Brown, filed on May 30, 2014, plaintiffs allege that the United States effected a taking of their property without just compensation in violation of the Fifth Amendment to the United States Constitution when the STB issued a NITU on February 3, 2012. Plaintiffs allege that once SC Central ceased operations on the railroad line, the railroad easement was abandoned and plaintiffs, as the fee owners of the underlying property, regained their right to the exclusive use and physical possession of their property. According to plaintiffs, but for operation of the Trails Act, plaintiffs would have the exclusive right to physical ownership, possession, and use of their property, free of any easement for recreational trail use or future railroad use. Plaintiffs allege that the "actions of the United States have resulted in the taking of Plaintiffs' property, by reason of the direct physical taking of Plaintiffs' property" and "damage to Plaintiffs' remaining adjacent property which has suffered a loss of privacy and other severance damages as a result of the proximity of the public on the adjoining trail." Plaintiffs seek to recover a monetary judgment representing the full market value of their property taken by the United States on the date it was taken,

February 3, 2012, as well as "severance damages," "delay damages," and costs and attorneys' fees.

When the amended complaints were filed in this court, SC Central was engaged in ongoing trail use negotiations with the Friends of Cheraw. While these negotiations proceeded, the parties submitted periodic, joint status reports to the court indicating whether SC Central and Friends of Cheraw had executed a final trail use agreement. In the joint status reports submitted to the court, the parties also informed the court about the progress of the appraisal process with respect to the properties at issue. On December 7, 2015, the parties informed the court that negotiations between Friends of Cheraw and SC Central had concluded without reaching a final trail use agreement, and that, on November 19, 2015, SC Central had notified the STB that it intended to discontinue service on the line.

Both plaintiffs and defendant have moved for partial summary judgment on the issue of liability pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) (2016). Defendant filed a motion for partial summary judgment asserting that neither a permanent nor a temporary physical taking had occurred as a result of the NITU issued by the STB on February 3, 2012. In response, plaintiffs filed a cross motion for partial summary judgment regarding defendant's liability for taking plaintiffs' right to unencumbered title and exclusive possession and use of their land without just compensation in violation of the Fifth Amendment to the United States Constitution.

## DISCUSSION

The court considers the parties' cross-motions for partial summary judgment. RCFC 56 is similar to Rule 56 of the Federal Rules of Civil Procedure in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); Fed. R. Civ. P. 56(a) (2016); see also Young v. United Parcel Serv., Inc., 135 S. Ct. 1338 (2015); Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016); Biery v. United States, 753 F.3d 1279, 1286 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Ladd v. United States, 713 F.3d 648, 651 (Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1309-10 (Fed. Cir. 2012); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d 1365, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2012); Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir.), reh'g denied (Fed. Cir. 2010); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 5 U.S. 1004 (2011); 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed.

Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Leggitte v. United States, 104 Fed. Cl. 315, 317 (2012); Arranaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011); Boensel v. United States, 99 Fed. Cl. 607, 610 (2011).

A fact is material if it will make a difference in the result of a case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248); Mata v. United States, 114 Fed. Cl. at 744; Arranaga v. United States, 103 Fed. Cl. at 467-68; Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 451 (2014); Dana R. Hodges Trust v. United States, 111 Fed. Cl. 452, 455 (2013); Cohen v. United States, 100 Fed. Cl. at 469-70; Boensel v. United States, 99 Fed. Cl. at 611; Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 F. App'x 507 (Fed. Cir. 2002), published at 317 F.3d 1331 (Fed. Cir. 2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. at 316. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d at 1372; Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1316 (Fed. Cir. 2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

In appropriate cases, summary judgment:

saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614-15 (1991) (quoting Pure Gold, Inc. v. Syntex, (U.S.A.) Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992) (citation omitted); see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 806 (Fed. Cir. 1999) ("The purpose of summary judgment is not to deprive a litigant of a trial, but to avoid an unnecessary trial when only one outcome can ensue."); Metric Constr. Co., Inc. v. United States, 73 Fed. Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Group, Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 562 U.S. 827 (2010); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Trust v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; Lathan Co. Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d at 1266-67; Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807. "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (Fed. Cir. 2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994), reh'g denied and en banc suggestion declined (Fed. Cir. 1995)), reh'g denied and en banc suggestion declined (Fed. Cir. 1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; RQ Squared, LLC v. United States, 119 Fed. Cl. 751, 757-758 (2015). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; see also Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1244; Florida Power & Light Co. v. United States, 375 F.3d 1119, 1124 (Fed. Cir. 2004); Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001); Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; Rasmuson v. United States, 109 Fed. Cl. 267, 271 (2013). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not automatically follow that summary judgment should be granted to one side or the other. See Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968–69 (Fed. Cir. 2009); B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378, (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading

& Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. See Frankel v. United States, 842 F.3d at 1249; First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); see also DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001); Gart v. Logitech, Inc., 254 F.3d 1334, 1338–39 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002); Oswalt v. United States, 85 Fed. Cl. 153, 158 (2008); Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006).

Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. See B.F. Goodrich Co. v. United States Filter Corp., 245 F.3d at 593; Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d at 1148; Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d at 2; Rogers v. United States, 90 Fed. Cl. at 427; Reading & Bates Corp. v. United States, 40 Fed. Cl. at 748.

"Questions of law are particularly appropriate for summary judgment." Oenga v. United States, 91 Fed. Cl. 629, 634 (2010) (citing Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999) ("Summary judgment was appropriate here [in Dana Corp.] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law. Moreover, on each issue one party or the other is entitled to judgment as a matter of law.")); see also Santa Fe Pac. R.R. v. United States, 294 F.3d 1336, 1340 (Fed. Cir. 2002) ("Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment.").

In the above-captioned cases in which both parties have moved for partial summary judgment, plaintiffs allege that defendant effected a taking under the Fifth Amendment to the United States Constitution through operation of the Trails Act. The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)), abrogated on other grounds by Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005), recognized by Hageland Aviation Servs., Inc. v. Harms, 210 P.3d 444 (Alaska 2009); see also Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123-24, reh'g denied, 439 U.S. 883 (1978); Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005); E. Enters. v. Apfel, 524 U.S. 498, 522 (1998); Rose Acre Farm, Inc. v. United States, 559 F.3d 1260, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2009), cert. denied, 559 U.S. 935 (2010); Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998); Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 469-70 (2009); Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. (13 Wall.) 166, 179 (1871) (citing to principles which establish that "private property may be taken for public uses when public necessity or utility requires"

11

and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified").

"[A] claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." E. Enters. v. Apfel, 524 U.S. at 520 (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016-19 (1984)); see also Acceptance Ins. Cos. v. United States, 503 F.3d 1328, 1336 (Fed. Cir. 2007); Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 12 (1990) (Preseault I) (quoting United States v. Causby, 328 U.S. 256, 267 (1946)); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005); Narramore v. United States, 960 F.2d 1048, 1052 (Fed. Cir. 1992); Hardy v. United States, 127 Fed. Cl. 1, 7 (2016); Perry v. United States, 28 Fed. Cl. 82, 84 (1993).

To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took a private property interest for public use without just compensation. See Dimare Fresh, Inc. v. United States, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (stating that the classic taking is one in which the government directly appropriates private property for its own use); Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006). "The issue of whether a taking has occurred is a question of law based on factual underpinnings." Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1377-78 (Fed. Cir.), cert. denied, 555 U.S. 1045 (2008). The government must be operating in its sovereign rather than in its proprietary capacity when it initiates a taking. See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1385 (Fed. Cir. 2008).

The United States Court of Appeals for the Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. See Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1348 (Fed. Cir. 2013); Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir.) (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)), reh'g denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings. See Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348. Then, the court must determine whether the government action is a "'compensable taking of that property interest.'" Huntleigh USA Corp v. United States, 525 F.3d at 1377 (quoting Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372).

To establish a taking, a plaintiff must have a legally cognizable property interest, such as the right of possession, use, or disposal of the property. See Loretto v.

Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v. Gen. Motors Corp., 323 U.S. 373 (1945)); Piszel v. United States, 833 F.3d 1366, 1374 (Fed. Cir. 2016); Rogers v. United States, 814 F.3d 1299, 1303 (Fed. Cir. 2015); Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348; CRV Enters., Inc. v. United States, 626 F.3d 1241, 1249 (Fed. Cir. 2010), cert. denied, 563 U.S. 989 (2011); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir.), reh'g denied and en banc suggestion denied (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001). "'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.'" Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 353 U.S. 1077 (2002) and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)). Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) and M & J Coal Co. v. United States, 47 F.3d at 1154). The court does not address the second step "without first identifying a cognizable property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir.) (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1381 and Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003)), reh'g denied and reh'g en banc denied (Fed. Cir. 2005). Only if there is to be a next step, "'after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest.'" Huntleigh USA Corp. v. United States, 525 F.3d at 1378 (quoting Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372); see also Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348.

     The STB has authority to regulate most railroad lines in the United States. See 49 U.S.C. § 702 (2012). A railroad seeking to abandon any part of its railroad line must either (1) file an application to abandon or (2) file a notice of exemption to abandon the line. See 49 U.S.C. § 10903 (2012); see also 49 C.F.R. § 1152.50 (2017). "If the STB approves a standard abandonment application or grants an exemption and the railroad ceases operation, the STB relinquishes jurisdiction over the abandoned railroad right-of-way and state law reversionary property interests, if any, take effect." Caldwell v. United States, 391 F.3d 1226, 1228-29 (Fed. Cir. 2004) (citing Preseault I, 494 U.S. at 6-8), reh'g en banc denied (Fed. Cir.), cert. denied, 546 U.S. 826 (2005).

     "The Trails Act is designed to preserve railroad rights-of-way by converting them into recreational trails." Bywaters v. United States, 670 F.3d 1221, 1225 (Fed. Cir. 2012). By operation of the Trails Act, the STB may issue a NITU, "suspending exemption proceedings for 180 days to allow a third party to enter into an agreement with the railroad to use the right-of-way as a recreational trail." Barclay v. United States, 443 F.3d 1368, 1371 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006), cert. denied, 846 U.S. 1209 (2007). Section 8(d) of the Trails Act, codified at 16 U.S.C. § 1247(d), "allows a railroad to negotiate with a state, municipal, or private group ('the trail operator') to assume financial responsibility for operating the railroad right of way as a recreational trail." See Bright v. United States, 603 F.3d 1273, 1275 (Fed. Cir.) (citing Caldwell v. United States, 391 F.3d at 1229), reh'g and reh'g en banc denied (Fed. Cir. 2010). If the railroad and an

authorized trail provider[3] reach an agreement, the NITU extends indefinitely, and the corridor is railbanked, with interim trail use permitted. See 49 C.F.R. § 1152.29(d)(1)-(2) (2016) ("The NITU will indicate that interim trail use is subject to future restoration of rail service . . . . Additionally, the NITU will provide that if the sponsor intends to terminate interim trail use on all or any portion of the right-of-way covered by the interim trail use agreement, it must send the [STB] a copy of the NITU and request that it be vacated on a specific date."); see also Biery v. United States, 753 F.3d 1279, 1285 (Fed. Cir. 2014) ("If the railroad and the [Surface Transportation] Board reach agreement, the land underlying the railway may be transferred to a trail operator (e.g., state, political subdivision, or qualified private organization) for interim trail use." (citing Citizens Against Rails–to–Trails v. Surface Transp. Bd., 267 F.3d 1144, 1149 (D.C. Cir. 2001))); Caldwell v. United States, 57 Fed. Cl. 193, 194 (2003) ("The term railbanking refers to the 'preservation of railroad corridor for future rail use,' while making the corridor available for other activities." (quoting Neb. Trails Council v. Surface Transp. Bd., 120 F.3d 901, 903 n.1 (8th Cir. 1997))), aff'd, 391 F.3d 1226 (Fed. Cir. 2004), reh'g en banc denied (Fed. Cir.), cert. denied, 546 U.S. 826 (2005).

When the NITU extends indefinitely and the corridor is railbanked, the STB retains jurisdiction and abandonment of the railroad corridor is blocked. See 16 U.S.C. § 1247(d) ("[I]n the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."); see also Rasmuson v. United States, 807 F.3d 1343, 1344 (Fed. Cir. 2015) ("NITUs 'preserve established railroad rights-of-way for future reactivation of rail service' and permit the railroad operator to cease operation without legally abandoning any 'rights-of-way for railroad purposes.'" (quoting 16 U.S.C. § 1247(d))).

As described by the United States Court of Appeals for the Federal Circuit:

Thus, section 8(d) of the Trails Act prevents the operation of state laws that would otherwise come into effect upon abandonment-property laws that would "result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners." Rail Abandonments-Use of Rights-of-Way as Trails, Ex Parte No. 274 (Sub-No. 13), 2 I.C.C. 2d 591, 1986 WL 68617 (1986). A Fifth Amendment taking occurs if the original easement granted to the railroad under state property law is not broad

---

[3] The Trails Act indicates that a trail provider may be "a State, political subdivision, or qualified private organization [that] is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way." 16 U.S.C. § 1247(d).

enough to encompass a recreational trail. See Preseault II, 100 F.3d at 1552; see also Toews [v. United States], 376 F.3d at 1376.

Caldwell v. United States, 391 F.3d at 1229; see also Rogers v. United States, 814 F.3d at 1303 ("As we have previously explained in other rails-to-trails cases, a taking, if any, occurs when, pursuant to the Trails Act, the STB issues a Notice of Interim Trail Use ('NITU') to suspend the abandonment of the rail line by a railroad and preserve it for future active railroad use." (citing Barclay v. United States, 443 F.3d at 1373)).

The Federal Circuit has established a three-part inquiry to determine takings liability in cases involving the conversion of railroad rights of way for recreational trail use by means of 16 U.S.C. § 1247(d) of the Trails Act, as follows:

(1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

Preseault v. United States, 100 F.3d 1525, 1533 (Fed. Cir. 1996) (Preseault II). Phrased differently, the Federal Circuit has also indicated:

the determinative issues for takings liability are (1) who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate; (2) if the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and (3) even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373 (Fed. Cir. 2009) (citing Preseault II, 100 F.3d at 1533).

According to the United States Court of Appeals for the Federal Circuit, "[i]t is settled law that a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." Ladd v. United States, 630 F.3d 1015, 1019 (Fed. Cir. 2010), reh'g and reh'g en banc denied, 646 F.3d 910 (Fed. Cir. 2011); see also Rogers v. United States, 814 F.3d at 1303; Ellamae Phillips Co. v. United States, 564 F.3d at 1373. "It is the law-created right to own private property, recognized and enforced by the Constitution, legislation,

and common law, that gives the owner an historically rooted expectation of compensation." Preseault II, 100 F.3d at 1540. The Federal Circuit in Preseault II also indicated:

> [T]hat power includes the power to preempt state-created property rights, including the rights to possession of property when railroad easements terminate. As Justice O'Connor succinctly pointed out in her concurring opinion in Preseault I, however, having and exercising the power of preemption is one thing; being free of the Constitutional obligation to pay just compensation for the state-created rights thus destroyed is another.

Id. at 1537 (citing Preseault I, 494 U.S. at 22).

To determine the nature of the property interest at issue, the court looks to state law. See Rogers v. United States, 814 F.3d at 1305 ("We analyze the property rights of the parties in a rails-to-trails case under the relevant state law."). The United States Court of Appeals for the Federal Circuit, interpreting a takings claim for a railroad right-of-way, stated that, "state law generally creates the property interest in a railroad right-of-way." Barclay v. United States, 443 F.3d at 1374 (citing Preseault I, 494 U.S. at 8, 16). In a footnote on the same page, the United States Court of Appeals for the Federal Circuit repeated, "[i]n Toews v. United States, 376 F.3d 1371 (Fed. Cir. 2004), we reiterated that state law controls the basic issue of whether trail use is beyond the scope of the right-of-way." Barclay v. United States, 443 F.3d at 1374 n.4. "The nature of the interest conveyed is determined according to the law of the state where the conveyance occurred. 'State law creates and defines the scope of the reversionary or other real property interests affected by the ICC's [Interstate Commerce Commission] action pursuant to Section 208 of the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d).'" Chevy Chase Land Co. of Montgomery Cnty. v. United States, 37 Fed. Cl. 545, 565 (1997) (quoting Preseault I, 494 U.S. at 20 (O'Connor, J., concurring) (citing Ruckelshaus v. Monsanto Co., 467 U.S. at 1001)), aff'd, 230 F.3d 1375 (Fed. Cir. 1999), reh'g and reh'g en banc denied (Fed. Cir.), cert. denied, 531 U.S. 957 (2000); see also Whispell Foreign Cars, Inc. v. United States, 97 Fed. Cl. 324, 331 ("Whether an individual has a compensable private property interest is determined by state law."), amended after recons. in part, 100 Fed. Cl. 529 (2011). Moreover, in Ruckelshaus v. Monsanto Co., 467 U.S. at 1001, the Supreme Court stated, "we are mindful of the basic axiom that '"[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."'" (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980) (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972))) (omission in original). In Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363 (1977), the United States Supreme Court stated that, "[u]nder our federal system, property ownership is not governed by a general federal law, but rather by the laws of the several States." Id. at 378; see also Davies Warehouse Co. v. Bowles, 321 U.S. 144, 155 (1944) ("The great body of law in this country which controls acquisition, transmission, and transfer of property, and defines the rights of its owners in relation to the state or to private parties, is found in the statutes and decisions of the state.").

As indicated above, defendant has moved for partial summary judgment in its favor, and plaintiffs have moved for partial summary judgment in their favor as to the issue of takings liability so that, if liability is found, the matter can proceed to the valuation stage to determine the just compensation due to each plaintiff. According to plaintiffs, "the federal government is constitutionally required to compensate these landowners for that property the federal government took from these owners when the Surface Transportation Board invoked §1247(d) of the National Trails System Act." Plaintiffs argue that the NITU permitted the land under the otherwise abandoned railroad easement to be used by the public for recreation, and, as a result, the owners lost their state-law right to exclusive possession and unencumbered title of their property. Alternatively, plaintiffs argue that the NITU "converted an easement originally granted for operation of a railroad to a conveyance for a completely different us [sic] – public recreation," and "[u]nder South Carolina law, converting an easement to a new use caused the easement to terminate and allowed the landowners to regain unencumbered possession of its property." Plaintiffs assert that "[o]n this essential issue of liability, there is no genuine dispute about the material facts. These landowners are entitled to judgment as a matter of law." Defendant asserts, however, that it is entitled to partial summary judgment because neither a permanent nor a temporary physical taking occurred as a result of the NITU issued by the STB on February 3, 2012. Defendant argues that there has been "no taking of Plaintiffs' property rights by operation of federal law" because the scope of the railroad's easements was not exceeded and, furthermore, the railroad never abandoned its easements. Defendant argues that during the period in which the railroad negotiated with the trail groups, there were no trail use easements imposed on plaintiffs' property, and at the end of the NITU period, SC Central elected to maintain its easements.

As a threshold matter, the above-captioned cases may be distinct from a number of other rails-to-trails cases, because these cases implicate a specific South Carolina statute relevant to plaintiffs' reversionary property interests. The South Carolina statute states, in pertinent part:

> A railroad right-of-way corridor held for railroad right-of-way preservation may be used for a public purpose compatible with preservation of the corridor for future transportation use on an interim basis until the corridor is used for rail transport. <u>A railroad corridor held for railroad right-of-way preservation is not abandoned for the purpose of any law.</u>

S.C. Code § 57-3-220(A) (2010). (emphasis added). This statute was enacted prior to the first NITU issued in this case on February 3, 2012, and the second NITU issued on May 31, 2013.[4] As stated above, on December 19, 2011, SC Central filed a Notice of

---

[4] In issuing the second NITU on May 31, 2013, the STB modified the original notice issued on June 6, 2012, exempting abandonment of the railroad line to the extent necessary to implement interim trail use/rail banking in order to permit Friends of Cheraw to negotiate with SC Central for trail use of the rail line. Notwithstanding the gap in time between the issuance of the first and second NITUs in this case, the court's takings analysis focuses on the issuance of the first NITU as the second NITU became an extension of the first. See <u>Barclay v. United States</u>, 443 F.3d at 1375 (explaining that "the series of STB NITU

Exemption with the STB seeking authorization "to abandon approximately 12.8 miles of [railroad] line in Chesterfield and Darlington Counties, SC, between milepost 319.89 +/-, near Society Hill, SC, and milepost 332.48, in Cheraw, SC" pursuant to "the class exemption at 49 C.F.R. § 1152.50." In the Notice of Exemption, SC Central stated that "[t]here are no local shippers on the Line" and that "[n]o local rail traffic" had moved over the line for the previous two years. Thereafter, the Town of Cheraw requested the "issuance of a Public Use Condition as well as an Interim Trail Use Condition rather than an outright abandonment authorization for approximately 12.8 miles of line in Chesterfield and Darlington Counties, South Carolina," and SC Central agreed to negotiate interim trail use/rail banking with the Town of Cheraw for the 12.8 mile railroad line between the Town of Cheraw and Society Hill. As a result of the agreement between SC Central and the Town of Cheraw to negotiate the preservation and interim use of the railroad corridor as a recreational trail, the STB issued a NITU on February 3, 2012 stating, "[t]he parties may negotiate an agreement during the 180-day period," and stating that "[i]f no agreement is reached within 180 days, SCRF may fully abandon the line." These facts indicate that, although SC Central, initially, may have sought to abandon the railroad corridor, SC Central changed course and agreed to negotiate transferring the railroad for preservation purposes and engaged in negotiations for three years with trail use groups in an effort to reach a rail preservation and trail use agreement. As indicated above, South Carolina statute § 57-3-220(A) states that a railroad corridor "held for railroad right-of-way preservation" may not be considered abandoned. It appears, therefore, that under South Carolina law, when a railroad demonstrates an intent to enter into an agreement designed to preserve a railroad right-of-way, the South Carolina statute precludes a finding of abandonment. In the above-captioned cases, SC Central did not reach a railbanking or trail use agreement with a third party, however that is not dispositive. SC Central's actions to negotiate a trail use agreement are sufficient to invoke § 57-3-220(A). As a result, plaintiffs' argument that the railroad was abandoned and that the NITU prevented plaintiffs' reversionary interests from springing into effect at some point is not persuasive.

Although the court may not consider the railroad's easements abandoned because of SC Central's efforts to enter a railroad preservation agreement, the court still may find that the NITU effected a temporary taking if the NITU authorized uses of the railroad easement that went beyond the scope of the easement. In these cases, the parties have stipulated, for the purposes of partial summary judgment, that the railroad held easements limited to railroad purposes when the NITU was issued. See Ladd v. United States, 630 F.3d at 1019 ("It is settled law that a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement."); see also Rogers v. United States, 107 Fed. Cl. 387, 393 (2012) ("[T]he taking occurs when the government, pursuant to the Trails Act, creates a new

_____

orders must be viewed as part of a single and continuous government action"); see also Biery v. United States, 99 Fed. Cl. 565, 580-81 (2011) ("The second NITU was in effect a modification and extension of the original NITU.").

easement for a recreational use over land that had been encumbered by an easement limited to railroad purposes.").

To determine in these cases whether takings have occurred, the court applies the standard for takings liability set forth by the United States Court of Appeals for the Federal Circuit in Preseault II, 100 F.3d at 1525:

(1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

Id. The parties have stipulated, for the purposes of partial summary judgment, that plaintiffs owned property adjacent to, and underlying, the railroad line at issue and that SC Central acquired only easements for railroad purposes that lay across plaintiffs' land. Thus, the first prong of the Preseault II analysis is met.

Regarding the second prong of the Preseault II analysis: "were the terms of the easement limited to use for railroad purposes, or did they include future use as public recreational trails," Preseault II, 100 F.3d at 1542-43, the United States Court of Appeals for the Federal Circuit stated in Toews v. United States, 376 F.3d at 1376, that "[i]t is elementary law that if the Government uses (or authorizes the use of . . .) an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use." Id. The parties do not dispute, for purposes of summary judgment, that the scope of the railroad's easements was limited to railroad purposes. The parties disagree in this case, however, as to whether the scope of the easements held by the railroad was exceeded by operation of the Trails Act. Because the railroad corridor at issue in the above-captioned cases was created pursuant an act of the South Carolinian legislature, the court looks to the laws of South Carolina to determine issues relating to the scope of the easements. See id. at 1375; see also Harley-White v. United States, 129 Fed. Cl. 548, 555 (2016).

Defendant submits that the scope of the railroad's easements was not exceeded because (1) "while the NITU was in effect . . . no trail use agreement was ever reached, and there was no transfer of SC Central's easements to any third party under the Trails Act," and (2) preservation of a railroad corridor is a railroad purpose consistent with the terms of the railroad's easements under South Carolina law. To support its position that the scope of the railroad's easements was not exceeded, defendant focuses on whether the railroad's easements ever were used for non-railroad purposes by operation of the Trails Act. In contrast, in arguing that the NITU effected a taking of plaintiffs' property interests, plaintiffs focus on whether the NITU authorized uses of the railroad's easements that went beyond railroad purposes. Plaintiffs argue that because the railroad held

easements for railroad purposes, "the STB's issuance of a NITU invoking §1247(d) to forestall state-law termination of the easement and authorize new and difference uses of the land is a compensable taking for which the Fifth Amendment compels the government to justly compensate the owner." Plaintiffs argue that, because defendant admits that SC Central only had a limited easement for railroad purposes, "[t]his settles the government's liability" for the taking of plaintiffs' property interests.

Defendant's argument that a taking has not occurred because no trail use agreement with a third party was reached and there was no transfer of the easements to a trail group is not persuasive in light of decisions by the United States Court of Appeals for the Federal Circuit. The Federal Circuit has found that, under the second part of the Preseault II test, the United States may be held liable under the Fifth Amendment when the use of a railroad easement allowed by operation of the Trails Act exceeds the scope of the easements held by the railroad. As explained above, in Preseault II, the Federal Circuit established that one of the three "determinative issues" to consider in analyzing a takings claim is "if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails." Preseault II, 100 F.3d at 1533. The Federal Circuit explained, "if the Government's use of the land for a recreational trail is not within the scope of the easements, then that use would constitute an unauthorized invasion of the land." Id. Similarly, the Federal Circuit held in Caldwell that "[a] Fifth Amendment taking occurs if the original easement granted to the railroad under state property law is not broad enough to encompass a recreational trail." Caldwell v. United States, 391 F.3d at 1229. Citing these Federal Circuit decisions, judges of the United States Court of Federal Claims have explained that the second prong of the Preseault II analysis is to determine whether the issuance of the NITU, authorizing the conversion of a railroad right-of-way to a public recreational trail, is beyond the scope of the relevant railroad's easement. See Harley-White v. United States, 129 Fed. Cl. at 555 (quoting Ladd v. United States, 630 F.3d at 1019) ("A taking occurs in a rails-to-trails case 'when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement.'"). In Barlow v. United States, 123 Fed. Cl. 186, 201 (2015), the court explained that, after determining that the railroad held an easement, "the Court next turns to the question of whether the scope of the easement for those parcels has been exceeded by the issuance of the NITU." Id.; see also Geneva Rock Products, Inc. v. United States, 107 Fed. Cl. 166, 171 (2012) ("If the easement granted under the 1875 Act was limited to railroad purposes and its scope does not include recreational trail use upon issuance of a NITU, then a taking will be established."); Thomas v. United States, 106 Fed. Cl. 467, 476 (2012) ("If the railroad receives only a railroad purpose easement and if the recreational trail use and railbanking authorized by the NITU exceed the scope of that easement and thereby prevent expiration of the easement and reversionary interests from vesting in the fee owners, then a Fifth Amendment taking has occurred."); Rhutasel v. United States, 105 Fed. Cl. 220, 227 (2012) (holding that "the conversion to a trail is completely unrelated to the operation of a railway; therefore, trail use falls outside the scope of the right-of-way deeds and condemned easements").

As these cases explain, the focus of the second inquiry of the <u>Preseault II</u> analysis is whether the terms of the easement at issue include public recreational trail use of the right-of-way, and not, as defendant asserts, whether a trail use agreement actually was reached. Therefore, if the STB issues a NITU that authorizes recreational trail use of railroad easements, and trail use is not contemplated in the terms of the railroad easements, the government has effected a taking. See <u>Macy Elevator, Inc. v. United States</u>, 97 Fed. Cl. at 718 ("[I]f the railroad did not receive a fee interest but only a railway easement and if the recreational trail use authorized by the NITU exceeds the scope of that railway easement, than a taking has occurred."). In <u>Toews v. United States</u>, 376 F.3d at 1376, the Federal Circuit explained that "[i]t is elementary law that if the Government uses . . . <u>or authorizes the use of</u> . . . an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use." <u>Id.</u> (emphasis added).

Notwithstanding defendant's argument that no trail use easement was imposed because no recreational trail use agreement was reached, the Federal Circuit has previously concluded that whether a trail use agreement is reached or a recreational trail is established is "irrelevant" to determining whether a taking has occurred. See <u>Ladd v. United States</u>, 630 F.3d at 1024. Defendant's argument that the railroad's easements were not exceeded because no trail use agreement was reached is similar to the argument the government pursued in <u>Ladd v. United States</u>, 630 F.3d at 1024. In <u>Ladd</u>, the government argued that "a Rails-to-Trails takings claim requires an actual conversion of a railroad to a new use that is outside the scope of the initial conveyance" and that "the NITU does not by itself result in such a conversion." <u>Id.</u> at 1023. Similar to the above-captioned cases currently before this court, in <u>Ladd</u> no trail use agreement was established at the time the complaint was filed. In its brief before the court, defendant "acknowledges that the Court in <u>Ladd</u> held that finalization of a trail use is not a precursor to a taking claim – whether it be permanent or temporary." Defendant asserts, however, that the above-captioned cases are distinguishable from <u>Ladd</u> because, in <u>Ladd</u>, the Federal Circuit did not consider a situation in which the railroad maintained its easement in perpetuity. Although the facts in <u>Ladd</u> are not identical to those in the above-captioned cases, in discussing rails-to-trails takings claims generally, the Federal Circuit in <u>Ladd</u> explained that because "a takings claim accrues on the date that a NITU issues, events arising after that date—including entering into a trail use agreement and converting the railway to a recreational trail—cannot be necessary elements of the claim." <u>Id.</u>; <u>see also</u> <u>Carolina Plating Works, Inc. v. United States</u>, 102 Fed. Cl. at 559 (explaining that "it is the issuance of the NITU, and not some later or earlier action in the nature of physical possession, that is the governmental act which blocks the state reversion property interest and thereby effectuates the takings"). The Federal Circuit in <u>Ladd</u> concluded that, when determining whether a taking has occurred, "it is irrelevant that no trail use agreement has been reached and that no recreational trail has been established." <u>Ladd v. United States</u>, 630 F.3d at 1024. In <u>Ladd</u>, the Federal Circuit indicated that whether a trail use agreement is reached may be a consideration in determining the duration of a taking, but not the underlying takings liability. <u>Id.</u> at 1025; <u>see</u> <u>also</u> <u>Memmer v. United States</u>, 122 Fed. Cl. 350, 365-66 (2015) ("The Federal Circuit's holdings are unambiguous: events arising after the Board issues the NITU have no effect on the existence of a Fifth Amendment taking, but may affect the nature of the taking to be compensated."). The

Federal Circuit's decision in <u>Ladd</u> is controlling here. Accordingly, defendant's argument that the scope of the railroad's easements was not exceeded because, after the NITU was issued, no trail use agreement was reached, fails and the court need not wait for the execution of a trail use agreement before finding that a taking has occurred. That a trail use agreement may never be reached does not change the court's conclusion, which is consistent with <u>Ladd</u>.

In opposition to plaintiffs' takings claims in this court, defendant does not argue that recreational trail use is within the scope of the railroad's easements. Defendant also does not contend that the NITU did not authorize trail use. Nor does defendant challenge plaintiffs' argument that "[p]ublic recreation is not a railroad purpose." As stated above, in its cross motion for partial summary judgment, defendant states that "the United States does not contest for the purposes of this motion that SC Central's easements were limited to railroad purposes." According to the United States Court of Appeals for the Federal Circuit "it appears beyond cavil that use of these [railroad] easements for a recreational trail . . . is not the same use made by a railroad, involving tracks, depots, and the running of trains." <u>Toews v. United States</u>, 376 F.3d at 1376; <u>see also</u> <u>The Ellamae Phillips Co. v. United States</u>, 99 Fed. Cl. 483, 487 (2011) (explaining that "[t]here is clear consensus that recreational trail use is fundamentally different in nature than railroad use"). Under existing Federal Circuit guidance, given that defendant has stipulated that the railroad's easements were limited to railroad purposes and that defendant does not argue that recreational trail use is a railroad purpose within the scope of the railroad's easements, the issuance of the NITU in these cases, which authorized recreational trail use of the railroad easements, would normally be found to exceed the scope of the railroad's easements. When "the NITU imposes both interim trail use and railbanking, the imposition of a recreational trail on the easement is sufficient to constitute a taking." <u>Capreal, Inc. v. United States</u>, 99 Fed. Cl. 133, 143 (2011); <u>see also</u> <u>Ladd v. United States</u>, 630 F.3d at 1019.

Nonetheless, in the above-captioned cases, defendant continues to assert that the scope of the railroad's easements was not exceeded because the maximum easement imposed by the NITU was a railbanking easement. Defendant tries to explain that, "railbanking is deemed a railroad purpose under South Carolina law," and the easements burdening plaintiffs' properties were limited to railroad purposes. Therefore, according to defendant, the imposition of a railbanking easement on plaintiffs' South Carolina properties did not exceed the easements already in place. To support its position, defendant points to South Carolina statute § 57-3-220(A), discussed above, and argues that the statute provides that, for the easements at issue, "railbanking is a railroad purpose," and that this statute "is what distinguishes it from the other cases." In response, plaintiffs argue that the South Carolina statute "cannot redefine property interests established and defined more than a century ago by the railroad's condemnation of this right-of-way."

At issue is whether railbanking is within the scope of the railroad's easements. The South Carolina statute § 57-3-220(A), to which defendant refers, states:

> A railroad right-of-way corridor held for railroad right-of-way preservation may be used for a public purpose compatible with preservation of the corridor for future transportation use on an interim basis until the corridor is used for rail transport. A railroad corridor held for railroad right-of-way preservation is not abandoned for the purpose of any law.

S.C. Code § 57-3-220(A). This language is similar to the language in 16 U.S.C. § 1247(d) of the Trails Act, which states:

> [I]n the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise . . . if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.

16 U.S.C. § 1247(d). The language contained in 16 U.S.C. § 1247(d), authorizing the preservation of railroad rights-of-way, which is similar to the language in South Carolina statute § 57-3-220(A), has been described by judges of the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims as "railbanking." See Preseault II, 100 F.3d at 1555; Caldwell v. United States, 57 Fed. Cl. at 194; Macy Elevator, Inc. v. United States, 97 Fed. Cl. at 711 ("[T]he Trails Act allows a railroad to relinquish responsibility for a rail line by transferring the corridor to an entity that will use it as a recreational trail. Although the corridor is not used as a railroad during the period of interim trail use, it remains intact for potential future use for rail service. This process is called 'railbanking.'"). Railbanking language, such as that contained in the Trails Act and the South Carolina statute, serves to insulate from abandonment a railroad easement that is used for a public purpose and "held for railroad right-of-way preservation." See 16 U.S.C. § 1247(d); S.C. Code § 57-3-220(A); see also Ladd v. United States, 630 F.3d at 1020 (explaining that the NITU is the only government action in the railbanking process that can operate to prevent abandonment of the railroad easement); Ybanez v. United States, 98 Fed. Cl. 659, 663 (2011) (explaining that issuance of the NITU by operation of the Trails Act blocks abandonment of a railroad right-of-way easement). While railbanking statutes may block abandonment of a railroad right-of-way in certain prescribed circumstances, abandonment of a railroad easement is separate and distinguishable from exceeding the scope of a railroad easement. See Geneva Rock Prods., Inc. v. United States, 107 Fed. Cl. at 172 (holding that "the existence of rail-banking, even if it may be sufficient to rescue the easement from abandonment through operation of state law, is not enough to insulate the government from a takings claim"); Capreal, Inc. v. United States, 99 Fed. Cl. at 146.   The Federal Circuit's analysis for determining a taking in rails-to-trails cases, as set forth in Preseault II, distinguishes between examining the scope of the easement and determining if the easement was abandoned. See Preseault II, 100 F.3d at 1555. These questions are put forth separately in the second and third prongs of the Preseault II analysis. See id. Thus, while defendant can rely on the South Carolina statute, which is quoted above, to argue that the railroad's easements were not abandoned, the statute is not dispositive to determine whether the scope of the railroad's easements was exceeded. In other words, the South Carolina

Case 1:14-cv-00006-MBH   Document 74   Filed 02/28/17   Page 24 of 31

statute may allow railbanking and block abandonment in these cases, but railbanking may still exceed the scope of the railroad's easements for railroad purposes.[5]

      As discussed above, the scope of a railroad easement is a matter of state law when the easement was created pursuant to state law, as it was in the above-captioned cases. See Toews v. United States, 376 F.3d at 1375; see also Harley-White v. United States, 129 Fed. Cl. at 555. Neither plaintiffs nor defendant cite to any cases arising in South Carolina state courts which interpret S.C. Code § 57-3-220(A), and there do not appear to be any South Carolina state court decisions on point which have found that railbanking is a railroad purpose within the scope of a railroad purposes easement under S.C. Code § 57-3-220(A). Nor has a judge of this court or the Court of Appeals for the Federal Circuit interpreted the South Carolina statute as it relates to a rails-to-trails decision. In other contexts, however, the Court of Appeals of South Carolina has addressed railroad rights-of-way which is useful to inform this court's consideration of the current cases. In Eldridge v. City of Greenwood, 388 S.E.2d 247, 249 (S.C. Ct. App. 1989) (Eldridge I), the Court of Appeals of South Carolina considered whether the removal of railroad tracks and the conveyance of the railroad right-of-way to local municipalities for the construction of a public road constituted an abandonment of the use of the right-of-way for railroad purposes. Id. In its decision, the court reviewed the statutory authority that created the railroad company, the Greenville and Columbia Railroad Company, and provided for its powers to obtain and hold property, codified at 1845 S.C. Act 227-28. See

---

[5] The court notes that in the above-captioned cases, trail use negotiations between SC Central and the Town of Cheraw and between SC Central and the Friends of Cheraw failed. Had the negotiations been successful and the NITU process been completed, the South Carolina statute could have been in conflict with the NITU process and raised the specter of preemption. As discussed above, S.C. Code § 57-3-220(A) states, in part, "[a] railroad corridor held for railroad right-of-way preservation is not abandoned for the purpose of any law." Id. This, however, appears inconsistent with the railbanking process under the Trails Act, in which the railroad files an application to abandon or discontinue service with the STB, 49 U.S.C. § 10903 (2012), or seeks a Notice of Exemption from that process pursuant to  49 U.S.C. § 10502, as SC Central did in the above-captioned cases. As indicated by Congress in the Trails Act, at 16 U.S.C. § 1241, titled, **"Congressional statement of policy and declaration of purpose,"** "In order to provide for the ever-increasing outdoor recreation needs of an expanding population and in order to promote the preservation of, public access to, travel within, and enjoyment and appreciation of the open-air, outdoor areas and historic resources of the Nation, trails should be established (i) primarily, near the urban areas of the Nation, and (ii) secondarily, within scenic areas and along historic travel routes of the Nation, which are often more remotely located." 16 U.S.C. § 1241(a) (emphasis in original). To the extent the sweeping language of the South Carolina statute § 57-3-220(A) would conflict with the purpose of the Trails Act and the process for abandonment identified by the STB in Title 49 of the United States Code, preemption might be an issue under different circumstances than those presented in the current cases.

id. The court explained that "[o]wnership of a right-of-way by a railroad company carries with it the right to use the property within the right-of-way for any purpose which furthers the business of the railroad," and that "[w]hen land is taken for railroad purposes, the railroad company acquires 'not merely the right to construct and maintain a railroad in accordance with the original plans, but it is the easement to make any use of the land for railroad purposes.'" Id.  In Eldridge I, the court concluded that "the operation of public roads . . . within the disputed right-of-way" did not appear to be "incident to the construction, maintenance, and operation of [the] railroad," and that the lower court had erred in holding that removing the railroad tracks and conveying the right-of-way so that it could be used for a public road did not constitute abandonment of the right-of-way. Eldridge I, 388 S.E.2d at 250-51. Nearly ten years after the decision in Eldridge I, the Court of Appeals of South Carolina in a second Eldridge case held that the use of the railroad's right-of-way for public highway purposes was inconsistent with the railroad's easement.  Eldridge v. City of Greenwood, 503 S.E.2d 191, 202 (S.C. Ct. App. 1998) (Eldridge II). The court held that when a "railroad derived its interest to the rights of way pursuant to a statutory provision," the statutory language should be given its "plain and ordinary meaning without resorting to subtle or forced construction to limit or expand a statute's operation." Eldridge II, 503 S.E.2d at 202. The South Carolina Court of Appeals stated that "[i]t is also a general rule of construction that statutory grants of eminent domain should be strictly construed." Id.

As in Eldridge I and Eldridge II, in the above-captioned James and Brown cases, the Cheraw and Darlington Railroad Company derived its power to construct the railroad line at issue from statute, specifically the 1849 Act to Charter the Cheraw and Darlington Railroad (and the 1846 Act to Charter the Wilmington and Manchester Railroad). The 1849 Act granted the Cheraw and Darlington Railroad Company an interest in the railroad line as long as it was used "only for the purposes of the said road, and no longer." The 1849 Act referenced the 1846 Act, which read in pertinent part:

> That the said President and Directors, their officers, agents and servants, shall have full power and authority to enter upon all lands and tenements, through which they may desire to conduct their Rail Road, and to lay out the same according to their pleasure, so that the dwelling house, yard, garden or graveyard of no person be invaded, without his consent, and that they shall have power to enter in and lay out such contiguous lands as they may desire to occupy, as sites for deposites, toll houses, warehouses, engine sheds, workshops, water stations, and other buildings, for the necessary accommodation of their officers, agents and servants, their horses, mules, and other cattle, and for the protection of the property entrusted to their care.

> . . .

> In the absence of any contract or contracts with the said company, in relation to land through which the said road may pass, signed by the owner thereof, or by his agent, or any claimant or person in possession thereof, which  may be confirmed by the owner therof, it shall be presumed that the

land upon which the road may be constructed, together with a space of sixty-five feet on each side of the centre of the said road, has been granted to the company by the owner or owners therof, and the said company shall have good right and title thereto, and shall have, hold, and enjoy the same, as long as the same may be used only for the purposes of the said road, and no longer. . .

1846 S.C. Acts 388. This statutory language indicates that the Cheraw and Darlington Railroad Company had authority to enter onto land for the purposes of the railroad and for constructing various types of specifically identified buildings, all of which were to be related to operating the railroad. The statute does not contemplate preservation of a railroad corridor for other future uses, or railbanking. Moreover, in this Circuit, judges have declined to find that railbanking is a railroad purpose. See, e.g., Preseault II, 100 F.3d at 1554 (Rader, J., concurring) (rejecting the railbanking argument as a "vague notion," incapable of overriding the present use of the property as a recreational trail); Capreal, Inc. v. United States, 99 Fed. Cl. at 146 (Interpreting Massachusetts law in which the court stated, "that railbanking is too hypothetical and unlikely to serve as a railroad purpose."); Nordhus Family Trust v. United States, 98 Fed. Cl. 331, 339 (2011) (Interpreting Kansas law, the court stated, "[i]n the present case, there is no evidence of any plan to reactivate the rail service—simply a speculative assertion by Defendant that some resumed rail service could occur in the future.  The transfer of the easement to entities completely unconnected with rail service, and the removal of all rail tracks on the corridor, lead the Court to conclude that any future rail use simply is unrealistic."); Macy Elevator, Inc. v. United States, 97 Fed. Cl. at 730 (Interpreting Indiana law and relying on Preseault II to deem railbanking "irrelevant to the question of whether a taking has occurred."); Rogers v. United States, 90 Fed. Cl. at 432 (Interpreting Florida law and indicating, "[h]ere, as in Preseault II, the use of the right-of-way as a public trail while preserving the right-of-way for future railroad activity was not something contemplated by the original parties to the Honore conveyance back in 1910."); Glosemeyer v. United States, 45 Fed. Cl. 771, 781 (2000) (Interpreting Missouri law, the court stated, "[i]n sum, neither component of railbanking-the preservation of the rail line for future use nor the 'interim' use of the easement as a recreation trail-constitutes a railroad purpose under Missouri law.").  Therefore, this court strictly construes the language in the statutory grant included in the 1849 Act to charter the Cheraw and Darlington Railroad, and the 1846 Act, so as to exclude railbanking as a railroad purpose under the easements. The guidance of the Court of Appeals of South Carolina in Eldridge I and Eldridge II, although not in direct parallel to the cases currently before the court, reinforce this court's conclusion. Therefore, the court concludes that the uses authorized by the NITU exceeded the scope of the railroad's easements.

Under South Carolina law, an easement for railroad purposes generally will be extinguished when the easement is converted for non-railroad use. See Eldridge II, 503 S.Ed.2d at 201-203 (disagreeing with appellants' argument that conversion from railroad use to public roadway use does not extinguish an easement). The Supreme Court of South Carolina also has specifically held that "an easement no longer used for its stated purposes has been abandoned and therefore extinguished." Faulkenberry v. Norfolk Southern Ry. Co., 563 S.E.2d 644, 646, n.3 (S.C. S.C. 2002). For example, in Immanuel

26

Baptist Church of N. Augusta v. Barnes, 264 S.E.2d 142, 144-45 (S.C. S.C. 1980), the Supreme Court of South Carolina explained that "an owner of an easement may relinquish that easement . . . if there is clear evidence of a purpose inconsistent with the existence of the easement . . . ." Id. In Saluda Motor Lines, Inc. v. Crouch, 386 S.E.2d 290, 291 (S.C. Ct. App. 1989), the Court of Appeals of South Carolina held that a railroad had extinguished its railroad right-of-way easements because the "conduct of the Motor Lines has been utterly inconsistent with intent to use the property involved for railroad purposes." Id. Considering these South Carolina Supreme Court decisions, there is a school of thought in South Carolina which has concluded that an easement can be extinguished when it is used for non-railroad purposes. Upon the extinguishment of the railroad purposes easement, plaintiffs have a right to their property unencumbered by the easement. See Marvin M. Brandt Revocable Trust v. United States, 134 S. Ct. 1257, 1265 (2014) ("In other words, if the beneficiary of the easement abandons it, the easement disappears, and the landowner resumes his full and unencumbered interest in the land."); see also Rogers v. United States, 107 Fed. Cl. at 393 (explaining that upon "termination of a railroad easement, the burden of the easement would simply be extinguished, and the landowner's property would be held free and clear of any such burden"). This, at first glance, is inconsistent with South Carolina statute § 57-3-220(A), which provides that a railroad right-of-way held for railroad preservation shall not be considered abandoned, yet, as stated above, there is no South Carolina case interpreting § 57-3-220(A). Although the South Carolina Supreme Court has held that an easement can be extinguished by use for non-railroad purposes, the South Carolina statute appears to block any abandonment or extinguishment of the railroad's easements under state law, "a railroad corridor held for railroad right of way preservation is not abandoned for the purpose of any law," S.C. Code § 57-3-220(A). As discussed above, the court concludes that the railroad easements were not abandoned under South Carolina law.

In the above-captioned cases, the NITU explicitly authorized use of the railroad's easements for recreational trail use. As discussed above, the court has found recreational trail use and railbanking as beyond the scope of the railroad purposes easements held by SC Central. When SC Central pursued the issuance of a NITU, which the STB subsequently issued, authorizing the railroad's easements to be used for recreational trail use, with attendant railbanking, the easements limited for railroad purposes were exceeded even though trail use did not become a reality. See Ladd v. United States, 630 F.3d at 1019 ("[A] Fifth Amendment taking occurs in a Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement."); see also Toews v. United States, 376 F.3d at 1376; see also Memmer v. United States, 122 Fed. Cl. at 365. The NITU imposed a new and different burden on the property. By operation of the Trails Act, the government exercised control over plaintiffs' property and effected a taking of plaintiffs' property. Even though no trail use was consummated, initially or after the second NITU was issued, the takings occurred with the issuance of the NITU and for the periods in which the NITU was in operation. Thus, after a trail use agreement was no longer viable, the railroad purposes easements remained in place as burdens on the plaintiffs' properties.

Having concluded that a taking occurred when the NITU was issued because the NITU authorized uses that exceeded the scope of the railroad's easements, the court turns to consider whether the taking was temporary or permanent. According to plaintiffs, the NITU effected a permanent taking of plaintiffs' right to the unencumbered use of their land. Plaintiffs argue that the taking does not end until the "STB vacates the original order invoking the Trails Act and no longer asserts jurisdiction over the owner's property." Defendant, however, argues that, even if the court determines that the NITU resulted in a taking, on the facts of these cases plaintiffs' claims can only be analyzed as a temporary taking. Defendant asserts that "the issuance of the NITU does not result in a per se temporary taking," and, argues that, instead, "the question of whether the STB's issuance of a NITU resulted in a temporary taking of Plaintiffs' property interests in the subject railroad corridor requires consideration of all facts and circumstances." According to defendant, plaintiffs cannot meet their burden to show that a temporary taking occurred as outlined by the United States Supreme Court's decision in <u>Arkansas Game and Fish Commission v. United States</u>, 133 S. Ct. 511, 522-23 (2012). According to defendant, in <u>Arkansas Game and Fish Commission</u>, the Supreme Court

> decreed that the test of liability for temporary takings both physical and regulatory turns on many factors the courts must weigh, including the duration and severity of the interference, the character of the land, the landowner's reasonable investment-backed expectations, and the degree to which the invasion is the intended or foreseeable result of authorized government action.

Defendant asserts that plaintiffs presented no evidence regarding these factors, and that an assessment of these factors reveals that the United States is not liable for a temporary taking of plaintiffs' property. According to defendant, a temporary taking of plaintiffs' property interests did not occur because the "NITU process did not delay the Railroad's abandonment in a manner that adversely affected the Plaintiffs' property rights." Defendant also argues that plaintiffs did not have any reasonable investment-backed expectations in full and unrestricted use of the property underlying the railroad line. Alternatively, defendant argues that, even if the court finds that a temporary taking occurred, "[a]ny taking found extends only from February 2012 to November 2015 – a period of less than three years." Defendant argues that, because SC Central filed the notice to discontinue service in November 2015, "SC Central can no longer abandon the rail line (or transfer it to a trail group) without another action by the STB."

The United States Court of Appeals for the Federal Circuit has held that "where no trail use agreement is reached, the taking may be temporary." <u>Ladd v. United States</u>, 630 F.3d at 1025. The Federal Circuit stated further that "[t]he duration of the taking goes to damages, not to whether a compensable taking has occurred." <u>Id.</u> In <u>Memmer v. United States</u>, 122 Fed. Cl. at 365-66, and <u>Caquelin v. United States</u>, 121 Fed. Cl. 658, 666 (2015), other judges of this court have found that a temporary taking occurred when the NITU had expired and no trail use agreement had been reached. In the above-captioned cases, the NITU remained in place for approximately three years, between February 3, 2012 and January 16, 2015, however the railroad was not able to execute a trail use agreement during that time and the authority to abandon the railroad line expired on

January 16, 2015. Notwithstanding defendant's argument that plaintiffs must satisfy certain factors to prove that a temporary taking occurred, the Federal Circuit unequivocally stated in <u>Ladd</u> that whether a taking is permanent or temporary does not affect whether a compensable taking has occurred, but, instead, to what damages plaintiffs may be entitled. "Post-NITU events may affect the duration of, and compensation for, the taking, but they do not foreclose the NITU from effecting the taking in the first instance." <u>Memmer v. United States</u>, 122 Fed. Cl. at 366; <u>see</u> <u>also</u> <u>Ladd v. United States</u>, 630 F.3d at 1025. As discussed more fully above, this court has concluded that a compensable taking occurred when the NITU was issued on February 3, 2012. Given that the NITU expired on January 16, 2015, and, at the same time, the authority to use the railroad's easements for recreational trail use and railbanking expired, the court finds the nature of the taking in these cases to be temporary.

Finally, in addition to the takings claims, the parties dispute whether certain plaintiffs can recover "severance damages" for the alleged impairment of plaintiffs' crossing rights by operation of the Trails Act.  Plaintiffs Sonoco Products, Inc., the Cribb Family Limited Partnership, Robert Nolan, L.E. Covington, Jr., and Dr. N.H. Beaver, Jr. own property on both sides of the railroad corridor and allege that the NITU impaired their ability to cross the railroad corridor and fully access their property. Defendant argues that these plaintiffs cannot demonstrate they are entitled to severance damages for alleged impairment of crossing rights as a result of action of the United States because the Trails Act authority did not prevent plaintiffs from crossing over any easement imposed. Defendant argues that the landowners have continued to cross the railroad corridor and that South Carolina law requires railroads to allow crossing rights. Defendant asserts that, although the Trails Act may postpone reversionary interests that would otherwise arise under state law, the Trails Act does not preempt all state law. Plaintiffs argue that defendant's argument is premature because "[t]he specific compensation due each of these South Carolina owners will be determined in the appraisal and valuation stage of this litigation," and the amount due to each owner is specific to the circumstances and appraisal of each owner's property. Alternatively, plaintiffs argue that the "[t]he STB's continuing jurisdiction to regulate this corridor under the Trails Act means federal law preempts South Carolina law," and that "the state law right to cross a railroad right-of-way, as it relates to severance damages, is something that has been preempted by the federal law." Plaintiffs argue that because the STB did not recognize plaintiffs' right to cross the corridor, plaintiffs did not retain the legal right to cross the corridor. According to plaintiffs, if plaintiffs who own property on both sides of the railroad corridor do not have the legal right to cross the railroad corridor, "then the property has to be appraised taking that fact into consideration."

The Trails Act authorizes the government to preempt state abandonment laws by issuing a NITU, which precludes the vesting of state law reversionary interests in an otherwise abandoned railroad right-of-way. <u>See</u> <u>Caldwell v. United States</u>, 391 F.3d at 1233; <u>see</u> <u>also</u> <u>Jenkins v. United States</u>, 102 Fed. Cl. 598, 615 (2011) (explaining that "the Trails Act authorizes the federal government to preempt state abandonment laws"). In <u>Dana R. Hodges Trust v. United States</u>, 111 Fed. Cl. 452, 456 (2013), another judge of this court found that, although state law claims of abandonment of a railroad right-of-way are preempted by operation of the Trails Act, the issuance of the NITU does not

preempt all state law property claims of a landowner. See id. Counsel for the above-captioned James plaintiffs put forth a similar preemption argument in Dana R. Hodges Trust v. United States, in which the plaintiffs sought severance damages and argued that their state law property rights, including their crossing rights, were entirely preempted when the STB invoked the Trails Act and issued a NITU. See id. In Dana R. Hodges Trust, the court found that plaintiffs "lack[ed] case support for their broader pre-emption argument that the Trails Act precludes all state law property law claims." Id. In that case, the court concluded that, while the Trails Act precludes a landowner's state law claim as to abandonment of a railroad easement, plaintiffs are not impeded from exercising whatever rights of access they held that pre-existed the conversion of the railroad corridor to recreational usage. Id.

   To support its position that the "federal Trails Act preempts state law altogether," plaintiffs further cite Preseault I, 494 U.S. at 20, and Grantwood Village v. Missouri Pacific Railroad Co., 95 F.3d 654, 657 (8th Cir. 1996). In both Preseault I and Grantwood Village, the courts also explained that the Trails Act preempts the operation of some, but not all, state laws. See Preseault I, 494 U.S. at 21 (O'Connor, J. concurring) (explaining that the ICC's actions preempt "the operation and effect of certain state laws"); Grantwood Village v. Mo. Pacific R.R. Co., 95 F.3d at 657 (explaining that because the "ICC has exclusive and plenary authority to determine whether a rail line has been abandoned . . . the question of whether [the railroad] abandoned the right-of-way necessarily involves federal law"). As the court concluded in Dana R. Hodges Trust v. United States, this court finds that plaintiffs have not submitted supportive case law or substantiated their broad position that the Trails Act preempts the operation of all state law. Moreover, the existing federal rails-to-trails case law suggests the opposite of plaintiffs' position and that the purpose of the Trails Act is to preempt the abandonment of a railroad right-of-way under applicable state law. See Rogers v. United States, 814 F.3d at 1303; Barclay v. United States, 443 F.3d at 1373 (explaining that the Trails Act operates to prevent abandonment of a railroad corridor and to preclude the vesting of state law reversionary interests in the right-of-way); Caquelin v. United States, 121 Fed. Cl. at 660, n.1 (explaining that the NITU serves as the mechanism that bars railroad abandonment); Rhutasel v. United States, 105 Fed. Cl. at 230 (explaining that the issuance of the NITU is the only government action that operates to preempt abandonment); Glosemeyer v. United States, 45 Fed. Cl. at 776 (explaining that the Trails Act works to thwart and preempt the termination of a railroad's right-of-way).

   The law in South Carolina establishes that a railroad possessing a mere easement over a landowner's property may not interfere with a landowner's right to cross. See Faulkenberry v. Norfolk Southern Ry. Co., 563 S.E.2d at 648 (holding that "the 1845 Charter created only an easement in Railroad, such that Faulkenberry . . . may cross the railroad tracks"); Miller v. Seaboard Air Line Ry., 77. S.E. 748 (S.C. S.C. 1913) (holding that when a railroad company acquires by deed or condemnation a right of way which divides a tracts, the owner has the right of crossing). As discussed above, the parties do not dispute, for the purpose of summary judgment, that the railroad held only an easement for railroad purposes, thus, pursuant to South Carolina property law, plaintiffs in the above-captioned cases had a right to cross the railroad easement held by SC Central and its predecessors. There is no support in South Carolina case law or in the Trails Act for

plaintiffs' argument that, by operation of the Trails Act, plaintiffs lost their crossing rights when the NITU was issued. Plaintiffs crossing rights have not changed. Instead, plaintiffs hold the same crossing rights over the trail use and railbanking easements imposed by the NITU and retain the same entry rights that plaintiffs held when SC Central received the easements for railroad purposes over plaintiffs' land.

The above-captioned cases are not ripe for a decision as to damages because the parties have not submitted briefing on damages, and, as plaintiffs assert, the compensation due to each plaintiff will be considered in the appraisal and valuation stage of this litigation.

## CONCLUSION

For the foregoing reasons, defendant's cross-motion for partial summary judgment is **DENIED**, and plaintiffs' cross-motion for partial summary judgment is **GRANTED**. The measure of just compensation to the plaintiffs for the taking of plaintiffs' property should be based on the takings time period and the additional trail use and railbanking easements that were imposed on plaintiffs' property, which was originally encumbered by the railroad purposes easement. Further proceedings will be established by separate Order.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**